# NO. 12-08-00077-CR

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *TIMOTHY JOHNSON,* *APPELLANT* | § | *APPEAL FROM THE 114TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT OF* |
| *THE STATE OF TEXAS,* *APPELLEE* | § | *SMITH COUNTY, TEXAS* |

## *OPINION*

Timothy Johnson appeals from his conviction for capital murder. In four issues, he argues that the trial court erred in allowing his statement to the police to be admitted into evidence and that the evidence is insufficient to support the conviction. We affirm.

### BACKGROUND

Late one night in September 2006, Donald Ray Donaldson asked Korrenthin Baker to leave Donaldson's house on Gardner Street in Tyler, Texas. Artrell Hayter followed Baker out of the house with a length of reinforced steel and encouraged him to move along. Donald lived at the house with his brother Bobby Earl Donaldson, and Hayter lived in the neighborhood.

Baker was upset about how he had been treated at the house, and he returned very early the next morning with a pistol. He shot Gary Mosley as he slept on a chair on the front porch. He then entered the house and shot Unnice Rogers, who was in bed with Donald Donaldson. He shot Presley Williams in the living room, and as he left the house, he shot George Cain on the front porch. After he was shot, Cain touched his wounds and put his hands in his pockets, getting blood on the money in his pocket. Baker took the bloody money out of Cain's pocket and stepped off the porch. Appellant was in his car, waiting for Baker, and he drove Baker away

from the scene of the shooting. Mosley and Rogers died from their gunshot wounds. Williams and Cain survived with serious injuries.

Hours later, Appellant and Baker bought eleven dollars worth of crack cocaine, paying with money that had dried blood on it. The police identified Baker as the shooter and suspected that Appellant had driven Baker to and from the shooting. They talked to Appellant the morning of the shooting, and he admitted being in the neighborhood within hours of the shooting, but he denied any further involvement. Appellant told the police he would be willing to discuss the matter with them further, and he accepted their invitation to come to the police station several days later to be interviewed.

During the interview, which was recorded by the police, Appellant related several different versions of the events that occurred the evening before and the morning of the shooting. The interview lasted for more than four hours. Towards the end of the interview, Appellant admitted that he knew Baker went to the house to "get" Donaldson, that he drove to and from the house, and that he witnessed the shooting on the porch. He also told the police that Jackie Banks, a friend of his from the neighborhood, probably knew more than he did about the shooting.

A Smith County grand jury indicted Appellant for the offense of capital murder of Unnice Rogers and Gary Mosley. The State did not seek the death penalty. Appellant pleaded not guilty, and a trial was held. Jackie Banks testified at the trial that she saw Appellant's vehicle at the scene of the shooting, heard his voice, and saw his vehicle drive away after the shooting. The jury found Appellant guilty of capital murder. The trial court assessed punishment at imprisonment for life. This appeal followed.

APPELLANT'S STATEMENT TO THE POLICE

In his first and second issues, Appellant argues that the trial court erred in overruling his motion to suppress his statement to the police. Specifically, he argues that he was in custody when he gave the statement, and the police officer's failure to advise him of his rights means the statement could not be used at trial.

**Applicable Law and Standard of Review**

2

In order for a statement taken from a person in custody to be admissible in court, the police must advise the person that he has the right to remain silent, that any statement he makes can be used against him, and that the person has a right to an attorney before the statement is taken. *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612, 16 L. Ed. 2d 694 (1966). Texas has a more specific rule, requiring that the *Miranda* warnings be given, that the suspect be told that he may terminate the interview at any time, and that statements be recorded or that the person sign a written statement. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22 (Vernon 2005). Generally, a statement obtained from a custodial interrogation that does not comply with these rules cannot be used in a trial. *See Miranda*, 384 U.S. at 444, 86 S. Ct. at 1612; TEX. CODE CRIM. PROC. ANN. art. 38.22, §§ 2(a), (b).

A person is in "custody" only if, under the circumstances, a reasonable person would believe that his freedom of movement was restrained to the degree associated with a formal arrest. *Herrera v. State*, 241 S.W.3d 520, 525 (Tex. Crim. App. 2007) (citing *Dowthitt v. State*, 931 S.W.2d 244, 254 (Tex. Crim. App. 1996)). Custody may occur in two general ways, either by the individual's being formally arrested, or by an individual's freedom of movement being restrained to the degree associated with a formal arrest. *See Thai Ngoc Nguyen v. State*, No. PD-0888-08, 2009 Tex. Crim. App. LEXIS 882, at *14 (Tex. Crim. App. July 1, 2009). An individual's freedom of movement may be restricted by a law enforcement officer telling a suspect he cannot leave or by the officer creating a situation that would lead a reasonable person to believe that his freedom of movement has been restricted, including when there is probable cause to arrest the suspect and the law enforcement officers do not tell the suspect he is free to leave. *Dowthitt*, 931 S.W.2d at 255. The test for whether a person is in custody is an objective one, and the definition of custody is the same for analysis pursuant to *Miranda* and article 38.22. *Herrera*, 241 S.W.3d at 525–26.

It is the defendant's burden to show that his statement was a product of a custodial interrogation. *Id*. at 526. We review a trial judge's ultimate "custody" determination with almost total deference when the questions of historical fact turn on credibility and demeanor. *Id*. at 526–27. Conversely, when the questions of historical fact do not turn on credibility and demeanor, we review a trial judge's "custody" determination de novo. *Id*. at 527.

**Analysis**

3

Appellant was not formally arrested when the police interrogated him. He drove himself to the police station, and he left the police station after his interrogation. Throughout the questioning, Appellant was told that he would be leaving at the end of the interview and that he was free to leave. He was left alone at times, his requests for water and breaks were heeded, and the police did not restrict his freedom of movement.

Appellant argues that he was in custody from the outset of the interview and that, even if he was not in custody initially, he was in custody after he "admitted to being at the scene of the murders, and driving Korrenthin Baker from the scene." Appellant cites **Dowthitt** for the proposition that a "crucial admission" can turn a noncustodial encounter into a custodial one. There are some differences between the two cases, but as the court recognized in **Dowthitt**, a crucial admission may cause an objective person to perceive that he is in custody in the appropriate circumstance. *See **Dowthitt***, 931 S.W.2d at 256. But the crucial statement itself is not the product of a custodial interrogation if custody ensues only after the admission. *See **id.*** at 262 (terming the crucial admission in that case as "precustodial").

In this case, the police questioned Appellant for more than four hours. In that time, he made two important incriminating statements. The first was that he knew what Baker was going to do at the house. By itself, this statement is not a crucial admission because it does not establish that Appellant did anything to subject himself to criminal liability. The second incriminating statement was Appellant's admission that he drove Baker to and from the home where Baker killed Rogers and Mosely. The transcripts of the interview form two exhibits, State's exhibits 190 and 191. Exhibit 190 is 163 pages long. Exhibit 191 is 159 pages long. Appellant's admission that he knew Baker was "going in there to get [Donald Donaldson]" and that Appellant took him there came on page 107 of exhibit 191. Prior to this point, Appellant had steadfastly maintained that he had not taken Baker back to the Donaldson house.

These two admissions, taken together, tend to establish that Appellant aided Baker and that he knew what it was that Baker was going to do. It is not clear that it occurred to Appellant or to the police that Appellant had made an important admission, and the police did not seize on the statement and tell Appellant that he had admitted to committing a crime. *See **Xu v. State***, 100 S.W.3d 408, 413 (Tex. App.–San Antonio 2002, pet. ref'd) (citing **Stansbury v. California**, 511 U.S. 318, 324–25, 128 L. Ed. 2d 293, 299–300, 114 S. Ct. 1526 (1994)) (The existence of probable cause does not necessarily establish custody unless it is manifested to the suspect and

4

that manifestation or other factors would cause a reasonable person to believe that he is restrained.).

Even if Appellant's admission caused the encounter to become a custodial interrogation, Appellant made no further significant concessions as to his involvement in the crime, and he did not argue to the trial court that it should suppress the statement from the point after he admitted to aiding Baker. Accordingly, even if Appellant was in custody after he admitted that he drove Baker to the residence—that statement came moments after his statement that he knew Baker "was going in there to get" Donaldson—he was not in custody at the time he made the admission. Said another way, a crucial admission may turn a voluntary encounter into a custodial interrogation, but the character of the questioning does not change until after the crucial admission is made. *See Dowthitt*, 931 S.W.2d at 257 ("'[C]ustody' began after appellant admitted to his presence during the murders.").

With respect to the broader question of whether Appellant was in custody for the entire interrogation, we hold that the trial court properly concluded that Appellant was not in custody. Some of the factors used to analyze whether an individual is in custody include, but are not limited to, whether the suspect arrived at the place of interrogation voluntarily, the length of the interrogation, whether the suspect's requests to see relatives and friends was refused, and the degree of control exercised over the suspect. *See Dowthitt*, 931 S.W.2d at 255–57.

In this case, Appellant arrived at the interrogation voluntarily, none of his requests were refused, and the police did not exercise a significant degree of control over him.[1] He was told repeatedly that he could leave, he was left alone for at least one period of time, and he left at the conclusion of the interview. These facts all support the trial court's finding that he was not in custody.

On the other side of the equation is the length of the interrogation and some of the tactics used by the police. The interrogation was long, more than four hours according to the testimony of the police officer. And there were factors that would have eroded a person's belief that he was truly free to go. First, the interrogation took place at the police station. Furthermore, the officers told Appellant that Baker had implicated him in the actual shooting, although they told Appellant they did not believe that he had shot anyone. Specifically, they told Appellant that he

---

[1] The police accompanied Appellant on bathroom breaks, although this was at his request, and he was frisked at one point.

5

should "be upset, because [Baker is] fixing to get you put in the penitentiary" and that ". . . the only way [he was] going to prevent [sic] going away forever [was] to be honest with [the police]."

Exasperated with Appellant's failure to tell them what they believed to have happened, the following exchange occurred:

[Officer]: Look, I'm through with you. I'm not going to pulling [sic] no more information out of you.

[Appellant]: Come on, man.

[Officer]: Do you want to spend the rest of your life in the pen?

[Appellant]: No, no, no.

[Officer]: Do you?

[Appellant]: No.

[Officer]: Then quit bullshitting.

[Appellant]: I'm not bullshitting you.

[Officer]: I've never tried so hard in my life to help somebody and them [sic] refuse my help.

[Appellant]: I want to help you. Look, I'm – – I'm – – I swear to God, I want to help you any way I can.

[Officer]: Don't swear to God again, because your life depends on this.

[Appellant]: Okay.

[Officer]: And this is the last time we're fixing to do this. We've got families at the house we haven't seen in days 'cause we've been working on this.

[Appellant]: I need some water, just any kind of water.

[Officer]: I'll go get you some water. I want you to relax a minute, okay, and I want you to think, 'cause we're going to start over from the beginning of the night. And you're going to tell this story one last time. You want to do that?

[Appellant]: I really want to. I want to help you any way I can.

[Officer]: No, you don't want to help me. You want me to help you. Because this is not my ass on the line. I'm going home.

[Appellant]: Yeah.

[Officer]: All right? And you know what? You're going home, too.

[Appellant]: I'm going home, too.

| [Officer]: | All right. You can go home right now if you want to. But I'm telling you, we're at the end of this investigation, guess what, I'm still going home. |
|---|---|
| [Appellant]: | Yeah. |
| [Officer]: | Whether or not you go home at the end of this entire investigation weeks from now depends on you. Now, if you want to go home right now, pack your shit and leave. |
| [Appellant]: | Okay. |
| [Officer]: | All right? Let me go grab you some water. |

Following this exchange Appellant repeated the story, again leaving out his involvement in the murders. He was told again that he could take a break or go home, but the officer told him that "once you walk out and you leave, I can't help you, I'm done with you. I'm here to help you right here tonight. You're free to go, go with your sister and go home." Appellant said that he did not want to go home and have to return for additional questioning. The police assured him that they were not going to ask to question him again. Appellant said that he did not want "nobody to come out and pick me up." The officer responded that he did not want to have to do that, but Appellant was "going to leave [him] no choice." The police also told Appellant that they were going to keep his car so they could search it and do forensic tests on the contents.

Appellant argues that this is subtle and clever questioning and that the police were working "through and around the constitutional and statutory protections that have been established as a result of overreaching and unconscionable violations of civil rights." It is accurate to say that the police did not give Appellant the warning required for a custodial interrogation. But these warnings are merely prophylactic rules of evidence that create a generally irrebutable presumption of coercion, and therefore inadmissibility, for unwarned custodial statements. *See United States v. Patane*, 542 U.S. 630, 639, 124 S. Ct. 2620, 2627, 159 L. Ed. 2d 667 (2004) (plurality op.). There is no such presumption for questioning that is not custodial. *See*, *e.g.*, *Beckwith v. United States*, 425 U.S. 341, 347–48, 96 S. Ct. 1612, 1616-17, 48 L. Ed. 2d 1 (1976) ("We recognize, of course, that noncustodial interrogation might possibly in some situations, by virtue of some special circumstances, be characterized as one where 'the behavior of… law enforcement officials was such as to overbear petitioner's will to resist and bring about confessions not freely self-determined….' When such a claim is raised, it

is the duty of an appellate court, including this Court, 'to examine the entire record and make an independent determination of the ultimate issue of voluntariness.'") (citations omitted).

The interrogation in this case certainly contained elements to test Appellant. But the question of whether Appellant's statement was voluntary or reliable is a different question than whether he was in custody.[2] The police repeatedly told Appellant that he was free to leave. Some of the statements made by the police were vague. But they honored Appellant's requests, told him he was going to go home whenever he wanted to leave, placed him closest to the door, unshackled and unimpeded, and did not exercise any physical control over his person. The length of the interrogation and the harshness of the encounter weigh against the trial court's finding. However, on balance, and after considering all of the evidence, we hold that the police did not create an environment in which a reasonable person would have believed he was not free to leave or that his freedom of movement had been curtailed.[3] As such, Appellant was not in custody, and so the trial court properly overruled Appellant's objection and properly allowed his statement to be admitted. We overrule Appellant's first and second issues.

## CORPUS DELICTI

In his third and fourth issues, Appellant argues that the evidence is legally and factually insufficient to support the verdict. Appellant's specific argument is that his confession is not corroborated and that there is a failure of proof as to the corpus delicti of the crime.

### Applicable Law

When the state relies on a statement or confession of the accused to support a conviction, there must be independent evidence that tends to establish the corpus delicti of the offense. *See*

---

[2] Appellant did not argue in the trial court and does not argue on appeal that his statement was involuntarily given. *See*, *e.g.*, **Schneckloth v. Bustamonte**, 412 U.S. 218, 226, 93 S. Ct. 2041, 2047–48, 36 L. Ed. 2d 854 (1973) (use of involuntary confession violates due process guarantees); *see also* **Lynumn v. Illinois**, 372 U.S. 528, 534, 83 S. Ct. 917, 920, 9 L. Ed. 2d 922 (1963) (statement involuntarily given because of threat to remove suspect from public assistance).

[3] In **Yarborough v. Alvarado**, 541 U.S. 652, 664–65, 124 S. Ct. 2140, 2149–50, 158 L. Ed. 2d 938 (2004), the Supreme Court upheld as reasonable a trial court determination that a suspect was not in custody under facts that are similar to this case, specifically, an extended interrogation of a suspect who appeared voluntarily and left after the interrogation. *See also* **Oregon v. Mathiason**, 429 U.S. 492, 495, 97 S. Ct. 711, 714, 50 L. Ed. 2d 714 (1977) ("[P]olice officers are not required to administer **Miranda** warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.").

8

*Fisher v. State*, 851 S.W.2d 298, 302–03 (Tex. Crim. App. 1993) (en banc). In this context, corpus delicti means the crime itself, and the state's evidence must show that a crime was committed. *Id*. at 303 ("The corpus delicti of a crime--any crime--simply consists of the fact that the crime in question has been committed by someone."). The corpus delicti rule is a common law, judicially created rule of evidence intended to ensure that a person will not be convicted based solely on his own false confession to a crime that never occurred. *See Salazar v. State*, 86 S.W.3d 640, 644 (Tex. Crim. App. 2002) ("The corpus delicti rule guarded against the shocking spectacle and deleterious effect upon the criminal justice system when a murder victim suddenly reappeared, hale and hearty, after his self-confessed murderer had been tried and executed.").

The corroborative evidence must show, in the case of a murder, the death of a human being caused by the criminal act of another. *See McDuff v. State*, 939 S.W.2d 607, 614 (Tex. Crim. App. 1997). That the defendant committed the offense may be established by his confession, and the corpus delicti rule is satisfied "if some evidence exists outside of the extra-judicial confession which, considered alone or in connection with the confession, shows that the crime actually occurred." *Salazar*, 86 S.W.3d at 644–45. In the case of capital murder, the corpus delicti requirement extends both to the murder and the additional element that makes the offense a capital murder. *See Rocha v. State*, 16 S.W.3d 1, 4–5 (Tex. Crim. App. 2000).

**Analysis**

Although numerous theories were submitted to the jury as to how the murder in this case was a capital murder, the parties focus on the most prominent theory, which is that Appellant had criminal responsibility as a party for the murder of two or more people. *See* TEX. PENAL CODE ANN. § 19.03(a)(7)(A) (Vernon Supp. 2009). As such, the corpus delicti–the crime that would have to be shown to corroborate Appellant's confession–is that the two people had been killed by criminal agency. *See Rocha*, 16 S.W.3d at 4. This was not disputed at trial, nor is it disputed on appeal.[4]

This would seem to end our inquiry as the identity of the perpetrator is not something that must be shown by corroborating corpus delicti evidence, and may be supplied by an extrajudicial confession alone. *See Gribble v. State*, 808 S.W.2d 65, 70 (Tex. Crim. App. 1990). However, Appellant argues that the corroborating evidence is not sufficient here because it does not corroborate his extrajudicial confession. This is not the test or the purpose for the corpus delicti

---

[4]In his brief, Appellant writes that "there is no doubt that Unnice Rogers and Gary Mosley were murdered."

9

rule.  The corpus delicti rule has the effect of requiring evidence to corroborate a confession, but only to the extent that there must have been a crime committed.  *See Salazar*, 86 S.W.3d at 644–45 ("The rule was not intended, however, to ensure that all confessions are corroborated in specific details or to ensure that the suspect does not falsely confess to a crime that did occur but for which he had no culpability.").

To the extent Appellant's argument may be understood to be that there is not independent evidence establishing that Baker had an accomplice, we hold that the evidence is sufficient. Donald Donaldson testified that, while standing outside the house after the shooting, he heard a woman's voice say, "There they go."  Jackie Banks was outside after the shooting, heard Appellant's voice, and saw his car leave the scene immediately after the shooting.  Finally, Appellant was with Baker later in the morning, and he purchased crack cocaine with money that had blood on it.  Appellant told the police that he got some money from Baker, and George Cain testified that he touched money in his pocket with his bloody hand after he was shot and that Baker took that money from him.

This evidence does more than establish that Baker had an accomplice; it provides "some evidence" to corroborate Appellant's statement to the police that he drove Baker to and from the shooting.  *See Salazar*, 86 S.W.2d at 645.  Accordingly, we hold that the corpus delicti rule is satisfied.

Finally, Appellant argues in one sentence in his concluding paragraph, that the evidence is not legally and factually sufficient to support the verdict.  We disagree.  Appellant's confession may be considered as part of the evidence as to sufficiency of the evidence generally. *See Emery v. State*, 881 S.W.2d 702, 705–06 (Tex. Crim. App. 1994).  Appellant confessed to driving Baker to and from the shooting and to knowing what Baker intended to do at the house. Accordingly, after considering all of the evidence, including Appellant's statement, we conclude that a rational trier of fact could have found that Appellant assisted Baker in the commission of a capital murder.  *See* TEX. PENAL CODE ANN. §§ 7.02(a)(2) (Vernon 2003) (criminal responsibility for conduct of another), 19.03 (capital murder).  Therefore, a rational jury could have found the essential elements of the offense beyond a reasonable doubt and the jury's verdict is not against the great weight and preponderance of the evidence, clearly wrong, or manifestly unjust. *See Jackson v. Virginia*, 443 U.S. 307, 315–16, 319, 99 S. Ct. 2781, 2786–89, 61 L. Ed.

10

2d 560 (1979) (legal sufficiency); ***Watson v. State***, 204 S.W.3d 404, 414, 417 (Tex. Crim. App. 2006) (factual sufficiency).

      We overrule Appellant's third and fourth issues.

## DISPOSITION

      Having overruled Appellant's four issues, we ***affirm*** the judgment of the trial court.

**BRIAN HOYLE**
Justice

Opinion delivered October 30, 2009.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J*

(PUBLISH)
