

# IN THE
# TENTH COURT OF APPEALS

## No. 10-10-00416-CR

**PRISSCILLA LORRAINE MECHELL,**

**Appellant**

 **v.**

**THE STATE OF TEXAS,**

**Appellee**

**From the 54th District Court
McLennan County, Texas
Trial Court No. 2009-1675-C2**

## O P I N I O N

Prisscilla Lorraine Mechell was charged with aggravated kidnapping, injury to a child, and abandoning a child. TEX. PENAL CODE ANN. §§ 20.04(b); 22.04; 22.041(b) (West 2011). Two days prior to trial, the indictment was amended to change the aggravating element of the aggravated kidnapping charge to the use or exhibition of a deadly weapon, that being a dumpster. Mechell made no objection to this change and waived the ten day notice requirement. *See* TEX. CODE CRIM. PROC. ANN. art. 28.10(a) (West 2006). On the day of her trial, Mechell pled guilty to the offense of abandoning a

child.  The jury found her guilty of all three offenses and assessed her punishment at 23 years, 5 years, and 20 years in prison, respectively.  Mechell has not appealed the conviction and sentence for injury to a child.  This appeal relates only to the other two offenses.  Because the evidence is sufficient to support the jury's deadly weapon finding and because her convictions for aggravated kidnapping and abandoning a child do not violate the Double Jeopardy Clause, we affirm the trial court's judgment.

## BACKGROUND

At the same time her friend, Kourtney Able, was pregnant, Mechell informed her friends and family that she, too, was pregnant.  She had a nursery prepared and had had a baby shower.  Kourtney gave birth to a son, Ryder.  Seven days later, on September 21, 2009, Mechell led everyone, including her family, to believe that she was being induced to have a baby that day.  That morning, she stopped by Kourtney's house, uninvited, to visit.  Kourtney was napping and awoke to find Mechell standing over her.  Mechell told Kourtney to go back to sleep and that she would watch Ryder.  When Kourtney awoke, Mechell and Ryder were gone.  Kourtney was frantic.  She called the police and she called Mechell.  Mechell said she was at the doctor's office and would come back.  Mechell was then contacted by a 911 operator.  She denied taking Ryder and when asked if she knew who took the baby, she suggested Kourtney's boyfriend's "baby mama."  She explained that Kourtney's boyfriend had recently had a baby with another woman.

When Mechell arrived at Kourtney's house, to Mechell's surprise, the police were on the scene.  She was taken to the police department where she was confronted with

the news that the police had checked and confirmed that Mechell was not a patient of the doctor she claimed to be seeing and that no delivery procedures were scheduled. Forty-five minutes into the interview with police, she confessed that she had taken Ryder and hid him in a dumpster when Kourtney called to tell Mechell of Ryder's disappearance. She later confessed that she was not pregnant but believed she had had a miscarriage and kept up the façade. She gave no reason for the façade other than that she and her husband had tried so hard to have another baby. At trial, she said it was to save her marriage. Mechell also confessed that when she took Ryder, she went to her house 15 minutes away and shaved Ryder's head to change his appearance.

### SUFFICIENCY OF THE EVIDENCE

In her first issue, Mechell contends that the evidence is legally insufficient to support the jury's deadly weapon finding. Specifically, Mechell argues that the evidence did not support a finding that the dumpster was a deadly weapon because first, there was insufficient evidence of serious bodily injury and second, there was insufficient evidence that the dumpster by its use was capable of causing serious bodily injury. A deadly weapon, as applied to this case, is defined as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." TEX. PENAL CODE ANN. § 1.07(a)(17)(B) (West 2011).

### *Standard of Review*

The standard enunciated in *Jackson v. Virginia* is the only standard a reviewing court applies in determining whether evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt. *Brooks v.*

*State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *see Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). Under the *Jackson* standard, a reviewing court should not "ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt." *Blackman v. State*, No. PD-0109-10, 2011 Tex. Crim. App. LEXIS 497, *18 (Tex. Crim. App. April 13, 2011) (quoting *Jackson*, 443 U.S. at 318-19) (emphasis in original). Rather, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319 (emphasis in original).

Each fact need not point directly and independently to the guilt of a defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). Reconciliation of conflicts and contradictions in the evidence is within the province of the jury. *Losada v. State*, 721 S.W.2d 305, 309 (Tex. Crim. App. 1986). The jury is entitled to judge the credibility of witnesses, and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991). Further, the prosecution has no affirmative duty to "rule out every hypothesis except that of guilt." *Blackman*, 2011 Tex. Crim. App. LEXIS 497 at *19 (quoting *Wright v. West*, 505 U.S. 277, 296, 112 S. Ct. 2482, 120 L. Ed. 2d 225 (1992)). The issue in this case, then, is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found beyond a reasonable doubt that the dumpster was a deadly weapon.

*Serious Bodily Injury*

Mechell first argues that the evidence did not support a finding that the dumpster was a deadly weapon because there was insufficient evidence of serious bodily injury. In support of this argument, she asserts that "shock" does not constitute serious bodily injury. Serious bodily injury is defined as "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." TEX. PENAL CODE ANN. § 1.07(a)(46) (West 2011). The State, however, does not have to prove that an object alleged to be a deadly weapon caused death or serious bodily injury; only that the object, in the manner of its use or intended use, was capable of causing death or serious bodily injury. *See McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000); *Jefferson v. State*, 974 S.W.2d 887, 892 (Tex. App.—Austin 1998, no pet.).

Nevertheless, in this case, there was sufficient evidence of serious bodily injury. As discussed in more detail in the next section, the State's expert, Dr. Hardy, who is board certified in pediatric critical care, testified that Ryder was in shock, that his heart rate was dangerously high, that his oxygen level was dangerously low, and that he was severely dehydrated. He also testified that had Ryder not been found and medical attention promptly given, Ryder would have died within 24 to 48 hours. Testimony that a wound could cause shock which, in turn, could cause death, has been held to be sufficient evidence of serious bodily injury. *See Boney v. State*, 572 S.W.2d 529, 532 (Tex. Crim. App. 1978). And, although Mechell's expert, Dr. Hermann, disagreed with Dr.

Hardy's analysis, the jury was free to disbelieve Dr. Hermann and believe Dr. Hardy's testimony.

Thus, this portion of Mechell's argument is overruled.

*Capable of Causing Serious Bodily Injury*

In the second part to her sufficiency claim, Mechell argues the evidence was insufficient to support a finding that the dumpster was a deadly weapon because the dumpster, by its *use*, was not *capable* of causing serious bodily injury (emphasis by Mechell).

Mechell was charged with aggravated kidnapping. A person commits aggravated kidnapping if the person intentionally or knowingly abducts another person and uses or exhibits a deadly weapon during the commission of the offense. TEX. PENAL CODE ANN. § 20.04(b) (West 2011). As stated previously, a deadly weapon, as applied to this case, is defined as "anything that in the manner of its use or intended use is capable of causing death or serious bodily injury." *Id*. § 1.07(a)(17)(B). Case law has made it clear that the word "anything" in the statute means *anything*. *Guzman v. State*, 188 S.W.3d 185, 198 (Tex. Crim. App. 2006) (Keller, P.J., concurring). Further, the placement of the word "capable" is crucial to understanding this particular definition in determining deadly-weapon status. *Tucker v. State*, 274 S.W.3d 688, 691 (Tex. Crim. App. 2008) (citing *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000)).

Objects that are not usually considered deadly weapons may become so, depending on the manner in which they are used during the commission of an offense. *Thomas v. State*, 821 S.W.2d 616, 620 (Tex. Crim. App. 1991) ( *i.e.* "automobiles, telephone

cords, bathwater, feather pillows, golf clubs or shanks"). Deadly weapons can include vehicles (*Drichas v. State*, 175 S.W.3d 795, 798 (Tex. Crim. App. 2005)), fists (*Lane v. State*, 151 S.W.3d 188, 190 (Tex. Crim. App. 2004)), chains, belts, and locks, (*Hill v. State*, 913 S.W.2d 581, 582-583 (Tex. Crim. App. 1996)), and hot water (*Gilbert v. State*, 769 S.W.2d 535, 536-537 (Tex. Crim. App. 1989) (notice case)). *Guzman*, 188 S.W.3d at 198, n. 28. A floor has also been held to be a deadly weapon. *Stanul v. State*, 870 S.W.2d 329 (Tex. App.—Austin 1994, pet. dism'd, pet. ref'd [2 pets.]. *Cf. Parris v. State*, 757 S.W.2d 842, 847 (Tex. App.—Dallas 1988, pet. ref'd) (sidewalk not deadly weapon absent evidence of purposeful use to inflict injury).

In support of her argument that the dumpster was not a deadly weapon, Mechell first contends that she did not intend to harm Ryder. However, the plain language of the deadly weapon provision does not require that the actor actually *intend* death or serious bodily injury; an object is a deadly weapon if the actor *intends a use* of the object in which it would be *capable* of causing death or serious bodily injury. *McCain v. State*, 22 S.W.3d 497, 503 (Tex. Crim. App. 2000) (emphasis added).

Mechell also contends that the word "capable" is only used to cover conduct that threatens deadly force, citing *McCain*, and that Ryder was too young to know he was threatened. We disagree with this contention. The Court, in *McCain*, recognized that placing the word "capable" in the definition of a deadly weapon "enables the statute to cover conduct that threatens deadly force…." However, it did not limit the word "capable" to just threats of deadly force. The Court's statement was an explanation that the word "capable" simply made it possible for the statute to include threats of deadly

force.  "Capable" is expansive, not limiting.  And even before *McCain*, the Court recognized that a victim need not necessarily testify as to having felt threatened.  *See Tisdale v. State*, 686 S.W.2d 110, 117 (Tex. Crim. App. 1985) (Clinton, J., concurring).

Since *McCain*, the Court of Criminal Appeals has not limited the meaning of capable as Mechell has argued.  In *Drichas v. State*, the Court said that "[c]apability is evaluated based on the circumstances that existed at the time of the offense." *Drichas v. State*, 175 S.W.3d 795, 799 (Tex. Crim. App. 2005).  In that case, the defendant evaded police in his vehicle and led them on a 15 mile chase.  The court of appeals found the evidence insufficient to support a finding that a vehicle was a deadly weapon because, although the manner the defendant used his vehicle was sufficient to render it a deadly weapon, the State failed to show actual danger.  *Id*. at 797.  But the Court of Criminal Appeals disagreed with the lower court and held that the manner in which the defendant used his vehicle made it capable of causing death or serious bodily injury.  *Id*. at 798.  The Court agreed that the danger posed must be actual, not hypothetical, but held that the statute did not require pursuing police officers or other motorists to be in a zone of danger to justify a deadly weapon finding.  *Id*. at 799.  A deadly weapon finding would be appropriate on a sufficient showing of actual danger, such as evidence that another motorist was on the highway at the same time as the defendant when the defendant drove in a dangerous manner.  *Id.*

Further, the Court in *Tucker v. State*, re-emphasized the breadth of *McCain* when it explained,

> The placement of the word "capable" is crucial to understanding this method of determining deadly-weapon status. The State is not required to show that the "use or intended use causes death or serious bodily injury" but that the "use or intended use is capable of causing death or serious bodily injury."

*Tucker v. State*, 274 S.W.3d 688, 691 (Tex. Crim. App. 2008) (footnotes omitted). In *Tucker*, the object used was unknown, and the Court held that even without expert testimony or a description of the weapon, the injuries suffered by the victim could, by themselves, be a sufficient basis for inferring that a deadly weapon was used. *Id*. at 691-92.

Thus, we will not limit the capability of the dumpster to cause death or serious bodily injury to threats only but will evaluate the dumpster's capability based on the circumstances as they existed at the time the offense was committed.

Mechell further claims that the dumpster was just a box. To the extent that this is an argument that the passive use of an object cannot support a deadly weapon finding, we also disagree with this argument. In *McCain*, the court of appeals, relying on the United States Supreme Court opinion in *Bailey v. United States*, 516 U.S. 137, 133 L. Ed. 2d 472, 116 S. Ct. 501 (1995), had determined the evidence to be insufficient to support a deadly weapon finding because the knife was not *actually* used. *See McCain v. State*, 22 S.W.3d 497, 500 (Tex. Crim. App. 2000). The court of appeals had observed that according to the Supreme Court, "use," in the context of a federal statute, involved employing a firearm "in a way that makes it an operative factor in the offense, such as brandishing, displaying, striking with, firing, or attempting to fire the firearm," or making a verbal reference to a firearm that was calculated to change the circumstances.

*Id.* The court of appeals further stated that "we have found no authority that any lesser use [than that described in *Bailey*], such as mere possession or carrying of a potentially deadly weapon, is adequate" to show the existence and use of a deadly weapon. *Id.* (Bracketed information inserted by Court of Criminal Appeals). In reversing the court of appeals, the Court of Criminal Appeals held:

> The Court of Appeals' reliance upon the Supreme Court's opinion in *Bailey* is misplaced. We have recently declined to follow *Bailey* in the community supervision context because the federal statute involved in *Bailey* contained materially different language than found in the state provision. *Gale v. State*, 998 S.W.2d 221, 225 (Tex. Crim. App. 1999). The reasoning in *Gale* applies equally to the case before us.

*McCain*, 22 S.W.3d at 502. Thus, based on this explanation and the ultimate holding of the Court of Criminal Appeals in *McCain*, even the passive use or intended use of an object can be sufficient to support a deadly weapon finding.

But Mechell's primary contention in support of her argument that the evidence is insufficient to support the jury's deadly weapon finding is that the dumpster's capability to cause death or serious bodily injury was hypothetical. She relies on two opinions by the Austin Court of Appeals to argue that Dr. Hardy's testimony encompassed only hypothetical possibilities of serious bodily injury or death and was not sufficient to support a deadly weapon finding. *See Johnston v. State*, 115 S.W.3d 761 (Tex. App.—Austin 2003), *aff'd on other grounds*, 145 S.W.3d 215 (Tex. Crim. App. 2004); *Rodriguez v. State*, 31 S.W.3d 772 (Tex. App.—Austin 2000), *aff'd on other grounds*, 104 S.W.3d 87 (Tex. Crim. App. 2003).

In *Johnston*, the State alleged a single episode of bodily injury to a child with a deadly weapon allegation involving a single cigarette burn to the palm of the child's hand. *Johnston*, 115 S.W.3d 762. The State relied on expert testimony regarding the cigarette's potential for causing serious bodily injury in other situations. *Id*. at 764. The Austin court held that the evidence was insufficient because the lit cigarette could only be capable of causing death or serious bodily injury if used in a manner different from that supported by the record. *Id*. The court of appeals stated:

> Appellant used a cigarette to make a single burn on the palm of C.T.'s hand. It is undisputed that the resulting injury was not serious, and the State offered no evidence that this use of a lighted cigarette was capable of causing serious bodily injury. Further, the State offered no evidence that the appellant intended to use the cigarette in any other manner that would have been capable of causing serious bodily injury. The fact that appellant could have caused serious bodily injury if he had used, or intended to use, the cigarette in a way other than he actually did does not support a deadly weapon finding.

*Id*. at 764.

The holding in *Rodriquez* is similar. In *Rodriguez*, the State sought to prove that cocaine constituted a deadly weapon in a prosecution for delivery of cocaine to a minor. *Rodriquez*, 31 S.W.3d at 776. The State presented testimony that cocaine was a lethal substance which could potentially cause death or serious bodily injury to first time users. *Id*. at 778. The defendant "used" the cocaine during the offense by placing it on a flat surface, chopping it with a razor blade, and arranging it into lines. *Id*. at 779. The court of appeals held that because there was no evidence either that defendant forced the minor to ingest the cocaine or as to the potency of the cocaine, the State failed to prove that the defendant's intended use of the cocaine, that being preparing the cocaine

for recreational use, was sufficient to support an affirmative finding that the cocaine had been used as a deadly weapon. *Id*.

In this case, however, the facts that existed when the crime was committed support a deadly weapon finding. Ryder was only seven days old when Mechell kidnapped him. Mechell admitted to putting Ryder in a dumpster at an abandoned gas station with nothing on but a diaper to hide him so no one could find him or trace him back to her if he was found. Although she denied doing so, an investigator testified at trial that Mechell told him she covered up Ryder with insulation. She also told the investigator either that she would rather die than get caught with the baby or that she would rather the baby die than get caught with him. At trial, Mechell denied saying this. During a videotaped interview, however, Mechell agreed that when she put Ryder in the dumpster, she was more concerned with saving herself than with the life of the baby. She also stated that she thought about the danger to Ryder as she drove away.

After the initial 45 minute interview with police, Mechell finally revealed where Ryder was hidden. That was at noon. The temperature that day ranged from 73 degrees in the morning to 89 degrees by 12:40 p.m. After receiving the information about Ryder's location, Sheriff's Deputy Brian Kevil went straight to the dumpster to look for Ryder. In the dumpster was construction debris such as trash bags, pink and yellow fiberglass insulation, and aluminum insulated ductwork. It was close to being full. Kevil started moving debris and heard a baby cry. He moved a trash bag and a bag of insulation before he could see Ryder on the very bottom of the dumpster. There was nothing between Ryder and the metal bottom of the dumpster. Ryder had his

knees up underneath him and was wearing only a diaper. His face was on the metal bottom of the dumpster. Ryder was pink in color, hot, had scrapes on his knees and shins, and had dirt on his face and in his mouth.

By the time Ryder was found in the dumpster and taken to the hospital, his blood oxygen level was at 89 percent which was lower than the normal 98 to 100 percent. Dr. Hardy stated that the lower the oxygen levels of the blood, the lower the amount of oxygen that is getting to the tissues and the brain and the more chance there is for damage. Ryder's vitals at the scene indicated that his heart rate was over 200 which was a dangerous level. Ryder was also dehydrated and was given three I.V. boluses of fluid. He was being treated for shock. There were multiple fire ant bites on Ryder's body and abrasions mainly on Ryder's knees and thigh area. A small cut was located on the bottom of Ryder's foot. Dr. Hardy opined that if Ryder was face down in the dumpster, his knees and feet kicking against the rough bottom of the dumpster would have caused the abrasions. Also, if Ryder had been dropped in the dumpster, the abrasions could have occurred as he dropped.

Dr. Hardy concluded that Ryder had suffered serious bodily injury because Ryder's body had already gone into shock and Ryder was being treated for shock. He also concluded that the shock was due to the act of being placed in a dumpster. Because Ryder's body was already in shock and needing resuscitation, Dr. Hardy did not believe Ryder could have survived in the dumpster more than 24 to 48 hours at the most.

Dr. Hardy further determined that the dumpster was a deadly weapon. He believed the act of intentionally "dumping" Ryder in the dumpster and exposing him to the elements placed Ryder's life at risk. By the time Ryder was found, he was already in shock and his heart rate was over 200. He was hot, and his body was in contact with a metal container. When the container is hot, Ryder would get hotter and his body would work harder. Had Ryder not been found by nightfall, Dr. Hardy believed the temperature of the dumpster would be colder and would take heat from Ryder, dropping his body temperature to a point where his heart would stop. Further, trash bags and insulation were in the dumpster with Ryder. And where Ryder was found in the dumpster posed a risk for suffocation because he was under bulky objects.[1]

It is undisputed that Mechell used or intended to use the dumpster to hide Ryder. Dr. Hardy based his conclusions on that particular use or intended use. Unlike the testimony presented in *Johnston* and *Rodriquez*, his testimony was not based on a different use or intended use of the dumpster. Therefore, on the facts of this case, any rational jury could have found beyond a reasonable doubt that in the manner Mechell used or intended to use the dumpster, it was capable of causing death or serious bodily injury. Accordingly, Mechell's first issue is overruled.

---

[1] On redirect, Dr. Hardy testified that if the dumpster had been emptied, that action would have caused Ryder death or serious bodily injury. Mechell contends that testimony is only a hypothetical result. In reviewing the pictures in evidence of the dumpster which showed that the dumpster was full, the jury could rationally believe that the dumpster was in need of being emptied and could have been emptied at any time after Ryder was placed in it. In this case, the harm to Ryder was actual, not hypothetical.

## DOUBLE JEOPARDY

In her second issue, Mechell argues that her convictions for aggravated kidnapping and abandoning a child resulted in multiple punishments for the same conduct which violated the prohibition against double jeopardy.

The Double Jeopardy Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, protects an accused against a second prosecution for the same offense for which he has been previously acquitted or previously convicted and protects him from being punished more than once for the same offense in a single prosecution. *Brown v. Ohio*, 432 U.S. 161, 164-65, 97 S. Ct. 2221, 53 L. Ed. 2d 187 (1977); *Gonzales v. State*, 304 S.W.3d 838, 845 (Tex. Crim. App. 2010). Mechell claims the protection from multiple punishments.

Sameness in this latter context is purely a matter of legislative intent. *Gonzales*, 304 S.W.3d at 845. And, "[w]ith respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366, 103 S. Ct. 673, 74 L. Ed. 2d 535 (1983). The traditional means to determine that legislative intent is the "same elements" test of *Blockburger v. United States*.[2] *Gonzales*, 304 S.W.3d at 845. According to that test, it should be presumed that the legislature did not regard two statutorily defined offenses to be the same so long as "each provision requires proof of a fact which the other does not." *Blockburger*, 284 U.S. at 304; *Gonzales*, 304 S.W.3d at 845. "But in Texas, when resolving whether two crimes

---

[2] *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932).

are the same for double-jeopardy purposes, we focus on the elements alleged in the charging instrument." *Bigon v. State*, 252 S.W.3d 360, 370 (Tex. Crim. App. 2008).

As alleged in the amended indictment, Mechell was charged in Count I with aggravated kidnapping by (1) intentionally or knowingly, (2) abducting Ryder Miller by restricting the movements of Ryder, (3) without his consent, (4) so as to interfere substantially with his liberty by moving him from one place to another, or confining him, (5) with the intent to prevent his liberation by secreting or holding him in a place where he was not likely to be found, and (6) Mechell did then and there use or exhibit a deadly weapon, to-wit: a dumpster during the commission of the offense.

In Count III, Mechell was charged with abandoning a child in that (1) while Mechell had custody, care, or control of Ryder Miller, (2) a child younger than 15 years of age, (3) she intentionally, (4) abandoned Ryder, (5) in a place under circumstances that exposed Ryder to an unreasonable risk of harm, (6) and under circumstances that a reasonable person would believe would place the child in imminent danger of death, bodily injury, or physical or mental impairment, to-wit: (7) placing Ryder in a dumpster at a closed gas station, (8) and Mechell did not voluntarily deliver the child to a designated emergency infant care provider under Section 262.302, Family Code.

When comparing the two charges as indicted, and taking into account all of the elements that the State must prove for these two charges, the two offenses are not the same under a strict application of the *Blockburger* test. The most obvious difference in the elements is the act alleged to have been committed. In the aggravated kidnapping charge, the State alleged Mechell *abducted* Ryder while in the abandoning a child charge,

the State alleged Mechell *abandoned* him.  One offense is for the taking of Ryder and the other is for the disposition of him.

Although Mechell and the State end their respective analyses here, for purposes of a multiple-punishment analysis, the *Blockburger* test is only one tool of statutory construction, not the exclusive tool.  *Gonzales*, 304 S.W.3d at 845.  Thus, even if a straightforward application of the *Blockburger* test would suggest that two offenses are not the "same" for double jeopardy purposes, if other considerations reveal a legislative intent that an accused not be punished for both offenses if they occur in the course of a single transaction, then an accused may not be punished for both offenses.  *Gonzales*, 304 S.W.3d at 845-46.  *See Ex parte Ervin*, 991 S.W.2d 804, 807 (Tex. Crim. App. 1999).  *Ervin* provided a non-exclusive catalog of considerations to help courts determine legislative intent in this context:

> … whether the offenses['] provisions are contained within the same statutory section, whether the offenses are phrased in the alternative, whether the offenses are named similarly, whether the offenses have common punishment ranges, whether the offenses have a common focus (i.e. whether the "gravamen" of the offense is the same) and whether that common focus tends to indicate a single instance of conduct,  . . . and whether there is legislative history containing an articulation of an intent to treat the offenses as the same or different for double jeopardy purposes.

*Ex parte Ervin*, 991 S.W.2d at 814.  More recently, the Court of Criminal Appeals has indicated that the "focus" or "gravamen" of a penal provision should be regarded as the "best" indicator when it comes to determining whether the legislature intended to define more than one offense.  *Gonzales*, 304 S.W.3d at 848.

The offenses of aggravated kidnapping and abandoning a child are not within the same statutory section. Aggravated kidnapping is contained within Penal Code Chapter 20, Kidnapping and Unlawful Restraint, and abandoning a child is contained within Penal Code Chapter 22, Assaultive Offenses. They are not phrased in the alternative and are not named similarly. They do not have common punishment ranges. As alleged, aggravated kidnapping is a first degree felony and abandoning a child is a second degree felony. Further, the offenses do not share a common focus. The focus of aggravated kidnapping is on the act of abducting the victim and the focus of abandoning a child is on the act of leaving the child in a place and under circumstance in which no reasonable adult would leave a child. The parties provide us with no legislative history containing an articulation of an intent to treat the offenses as the same or different for double jeopardy purposes, and we have found none. Accordingly, using the considerations set out by *Ex parte Ervin*, there is no indication that the legislature intended an accused not to be punished for the offenses of aggravated kidnapping and abandoning a child if they occur in the course of a single transaction.

Because the two offenses are not the same for the purposes of double jeopardy under both the *Blockburger* "sameness" test and a legislative intent analysis, Mechell's second issue is overruled.

## CONCLUSION

Having overruled each issue on appeal, we affirm the trial court's judgment.


TOM GRAY
Chief Justice

Before Chief Justice Gray,
      Justice Davis, and
      Justice Scoggins
Affirmed
Opinion delivered and filed September 14, 2011
Publish
[CRPM]