ACCEPTED
05-14-01066-CR
FIFTH COURT OF APPEALS
DALLAS, TEXAS
2/19/2015 4:54:02 PM
LISA MATZ
CLERK

In the Court of Appeals for the
Fifth District of Texas at Dallas

**KRISTIE LYN HERMES,**
   Appellant

v.

**THE STATE OF TEXAS,**
   Appellee

§
§
§
§
§
§
§
§

RECEIVED IN
5th COURT OF APPEALS
DALLAS, TEXAS
2/19/2015 4:54:02 PM
LISA MATZ
Clerk

**No. 05-14-01066-CR**

Trial Number 416-81667-2013, in the 416th District Court
Collin County, Texas.
The Honorable Chris Oldner, Judge Presiding.

_____

STATE'S BRIEF

_____

_Oral argument is not requested,
unless Appellant requests argument._

**GREG WILLIS**
Criminal District Attorney
Collin County, Texas

**JOHN R. ROLATER, JR.**
Assistant Criminal District Attorney
Chief of the Appellate Division

**LIBBY LANGE**
Assistant Criminal District Attorney
2100 Bloomdale Rd., Suite 200
McKinney, Texas 75071
(972) 548-4323
FAX (214) 491-4860
State Bar No. 11910100
llange@co.collin.tx.us

**GEETA SINGLETARY &
CYNTHIA WALKER**
Assistant Criminal District Attorneys

# TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................i

INDEX OF AUTHORITIES....................................................................................... iii

STATEMENT REGARDING ORAL ARGUMENT ................................................1

STATEMENT OF THE CASE..................................................................................1

STATEMENT OF FACTS ........................................................................................1

    The Accident ........................................................................................................1

    Appellant's Recorded Statements........................................................................7

    The Blood Evidence..............................................................................................8

    Franco's Injuries ................................................................................................10

SUMMARY OF THE STATE'S ARGUMENTS ...................................................15

STATE'S REPLY TO APPELLANT'S ISSUES
  (The Corpus Delicti Rule & Sufficiency of the Evidence).................................16

The corpus delicti rule was satisfied because the State introduced
evidence other than Appellant's extrajudicial statements showing that
the crime of intoxication assault occurred. Because the corpus delicti
rule was satisfied, Appellant's own admissions were sufficient to
establish that she was driving at the time of the accident. Also,
Appellant's .091 blood-alcohol level two hours after the accident,
coupled with her admissions to drinking alcohol and smoking
marijuana and other corroborating evidence, established that she was
driving while intoxicated at the time of the accident. While the victim
downplayed the severity of his injuries, his testimony along with that
of an attending doctor, established that he suffered serious bodily
injury.

I.      The Corpus Delicti Rule Was Satisfied...................................................17

II.    The Evidence Supports the Conviction ...................................................21

PRAYER .............................................................................................32

CERTIFICATE OF SERVICE ..........................................................33

CERTIFICATE OF COMPLIANCE.................................................33

# INDEX OF AUTHORITIES

**Statutes, Codes, and Rules**

TEX. PENAL CODE § 49.01(2)(A) ........................................................................23

TEX. PENAL CODE § 49.07.......................................................................... 1, 18, 26

**Cases**

*Andrus v. State*,
   Nos. 05-08-00703-CR, 05-08-00704-CR, 2010 WL 797196
   (Tex. App.—Dallas Mar. 10, 2010, no pet.)
   (not designated for publication)....................................................................27

*Barrera v. State*,
   820 S.W.2d 194 (Tex. App.—Corpus Christi 1991, pet. ref'd)...........................31

*Boney v. State*,
   572 S.W.2d 529 (Tex. Crim. App. 1978)..............................................................31

*Brooks v. State*,
   323 S.W.3d 893 (Tex. Crim. App. 2010)..............................................................21

*Cardenas v. State*,
   30 S.W.3d 384 (Tex. Crim. App. 2000)................................................................18

*Carrizales v. State*,
   414 S.W.3d 737 (Tex. Crim. App. 2013).................................................... 17, 22

*Coleman v. State*,
   704 S.W.2d 511(Tex. App.—Houston [1st Dist.] 1986, pet. ref'd) .....................19

*Coshatt v. State*,
   744 S.W.2d 633 (Tex. App.—Dallas 1987, pet. ref'd)........................................28

*Folk v. State*,
   797 S.W.2d 141 (Tex. App.—Austin 1990, pet. ref'd) ........................................20

*Gribble v. State*,
  808 S.W.2d 65 (Tex. Crim. App. 1990) ...............................................................20

*Hacker v. State*,
  389 S.W.3d 860 (Tex. Crim. App. 2013) .............................................................22

*Hanson v. State*,
  781 S.W.2d 445(Tex. App.—Fort Worth 1989), *abated on other grounds,*
  790 S.W.2d 646 (Tex. Crim. App. 1990) ............................................................19

*Henderson v. State*,
  29 S.W.3d 616 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd).....................25

*Hooper v. State*,
  214 S.W.3d 9 (Tex. Crim.  App. 2007) ...............................................................21

*Jackson v. State*,
  399 S.W.3d 285 (Tex. App.—Waco 2013, no pet.).............................................27

*Jackson v. Virginia*,
  443 U.S. 307 (1979) ............................................................................................21

*Johnson v. State*,
  299 S.W.3d 491 (Tex. App.—Tyler 2009, no pet.).............................................17

*Kellis v. State*,
  No. 14-04-01044-CR, 2006 WL 278380
  (Tex. App.—Houston [14th Dist.] Feb. 7, 2006, no pet.)
  (not designated for publication) ..........................................................................20

*Kirsch v. State*,
  306 S.W.3d 738 (Tex. Crim. App. 2010) ..................................................... 23, 24

*Kuciemba v. State*,
  310 S.W.3d 460 (Tex. Crim. App. 2010) ............................................................23

*Madden v. State*,
  911 S.W.2d 236 (Tex. App.—Waco 1987, pet. ref'd).........................................28

*McCann v. State*,
433 S.W.3d 642 (Tex. App.—Houston [1st Dist.] 2014, no pet.)........... 18, 19, 23

*Mechell v. State*,
374 S.W.3d 454 (Tex. App.—Waco 2011, pet. ref'd)..........................................31

*Moore v. State*,
739 S.W.2d 347 (Tex. Crim. App. 1987) .................................... 26, 27, 28, 29, 30

*Salazar v. State*,
86 S.W.3d 640 (Tex. Crim. App. 2002) ............................................................17

*Scillitani v. State*,
343 S.W.3d 914 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd) .................25

*Taylor v. State*,
71 S.W.3d 792 (Tex. App.—Texarkana 2002, pet. ref'd) ...................................27

*Threet v. State,*
250 S.W.2d 200 (Tex. Crim. App. 1952) ..........................................................19

*Vaughn v. State*,
833 S.W.2d 180 (Tex. App.—Dallas 1992, pet. ref'd).......................................22

*Wesbrook v. State*,
29 S.W.3d 103 (Tex. Crim. App. 2000) ............................................................21

*Williams v. State*,
235 S.W.3d 742 (Tex. Crim. App. 2007) ..........................................................21

*Zill v. State*,
355 S.W.3d 778 (Tex. App.—Houston [1st Dist.] 2011, no pet.)........................25

## STATEMENT REGARDING ORAL ARGUMENT

The State does not believe oral argument will assist the Court in developing the issues in this case; however, if the Court grants Appellant's request for argument, the State requests the opportunity to argue.

## STATEMENT OF THE CASE

A jury convicted Appellant Kristie Lyn Hermes of intoxication assault, found that she used or exhibited a deadly weapon, assessed punishment at four years in prison, and recommended that she be granted community supervision.[1] CR 11, 56-57, 61-62; 4 RR 96-97, 108.  The trial court suspended Appellant's sentence and placed her on community supervision for five years.  CR 63; 4 RR 112.

## STATEMENT OF FACTS

**The Accident**

*The Civilian's Account*

Around 4:30 on the morning of November 27, 2011, Holly Love was driving to work southbound on Custer Road in Frisco when she saw a woman, identified as Appellant, in the road waving her arms.  2 RR 175-76, 203.  When Love slowed down, Appellant, who appeared to be in her twenties and was crying, approached her window and said she had been in a bad accident.  2 RR 176-77, 202.

---

[1] *See* Tex. Penal Code § 49.07.

1

Appellant's face was covered in blood that appeared to be flowing from the top of her head.  2 RR 183-84.  The accident scene was not immediately visible, so Love got out of her car and walked with Appellant up an incline.  2 RR 177.  As they walked, Appellant spontaneously stated, "I drank three beers."  2 RR 202.  She kept repeating, "I want to call my mom, we only had a few beers, I want to call my mom."  2 RR 177.  Appellant also said she had been at a party and smoked marijuana.  2 RR 177, 196.

When Love saw the vehicle that Appellant had led her to, Love could tell that it had obviously rolled, and it appeared to have been a one-car accident.  There were no other cars around.  2 RR 177, 180.  A young man was lying in the road, and Appellant said she had been driving and that he had been ejected from the car.  2 RR 177, 180, 186-87, 196.  Love called 911, and in a very distressed voice, told the operator that there had been a "horrible accident."  2 RR 181-82; SX 1 at 0:26-0:28.

Love did not notice an odor of drugs or alcohol on Appellant, and she did not remember Appellant slurring her words.  2 RR 191-93.  Appellant made sense enough that Love understood what she was trying to tell her, although she also made some "random statements."  3 RR 192, 198.  Love felt that Appellant told her about the beer and marijuana because she knew it contributed to the accident and "it was a guilty conscious speaking."  2 RR 201.

2

It was cold and very dark that morning, but it was not raining, snowing, or windy.  2 RR 178, 182-83, 190.  The road was smooth, and Love had never had any trouble navigating that road, which she traveled often on her way to work.  2 RR 179.

*Law Enforcement's Accounts*

When first-responder Frisco Police Officer Kevin Kryczkowski arrived, he saw both Appellant and a man—later identified as Cesar Franco—lying in the roadway.[2]  2 RR 258-61; 3 RR 21-24.  Franco had suffered so much trauma that he did not understand what was going on.  3 RR 24-25.  Appellant was initially unconscious, but as Officer Kryczkowski spoke with her, she became "frantic."  3 RR 23.  The blood from the top of her head was running down her face.  3 RR 23.  Appellant volunteered that, the evening before the accident, she had consumed three to four beers and smoked marijuana.  3 RR 27-28.  She also said that she had been driving at the time of the accident.  3 RR 52-53; SX 2 at 3:23-3:26.  Officer Kryczkowski did not smell the odor of alcohol or marijuana on Appellant, although it would have been difficult to discern alcohol in a situation like this due to the wind, the smell of burnt metal, and the distraction of blood running down her face.

---

[2] The officer's in-car camera remained stationary and illuminated the median and some of the debris from the accident.  It did not capture the accident scene, other than the EMS workers, police officers, and firefighters walking back and forth in front of the camera. 2 RR 261-62; SX 2. Officer Kryczkowski's body microphone captured several conversations and other sounds, including moaning and crying.

3 RR 82. He could not tell if Appellant was slurring her words because of the state she was in. 3 RR 72-73.

When Officer Kryczkowski asked her about the last thing she remembered, Appellant recalled passing through the intersection at "Stonebriar" but did not know how she got to where she was. 3 RR 25-27. Officer Kryczkowski knew that the nearest intersection north of the accident was "Stonebridge" and that it was several hundred yards back from where the skid marks began and between a fourth and a half mile from where he found Franco and Appellant. 3 RR 26-27. Appellant's lack of memory about what may have precipitated the crash did not make sense to Officer Kryczkowski, and in his opinion, Appellant had been driving while intoxicated that night. 3 RR 27, 82.

Officer Jason Hinkle conducted the crash scene investigation. 3 RR 244-45. He initially observed that the Jeep's windows were "busted," there was blood inside and out of the Jeep, the Jeep's roof was caved in, and there were scrape marks on the Jeep's roof, fenders, and hood. 3 RR 252-53, 258; SX 10. The roadway evidence, including visible skid marks on the road, deep gouges in the grass of the median, and debris from the Jeep, revealed that the Jeep had been traveling in the left lane when it began to drift gradually toward the right lane. It then ran up on the right-lane curb, headed back toward the left lane, flipped

4

multiple times, and ended up in the road's center median.  3 RR 246-58; SX 10.   It was not entirely clear whether the brakes had been applied.  3 RR 256-57.

On cross-examination, Officer Hinkle testified to the following:

Q. [Defense Counsel]: You didn't know whether or not the cause of that roll was the intoxication of [Appellant], correct?

A. [Officer Hinkle]: It is possible.

* * *

Q. You would also agree with me that something other than her intoxication caused that roll, correct?

A. It could be.

Q. That means it's a possibility; is that right?

A. Yes.

Q. And when we're talking about proof beyond a reasonable doubt, you would agree with me that there's no way anybody can say beyond a reasonable doubt that her intoxication caused that roll if you're conceding that it's possible that it didn't.

A. No, I can't say.

Q. Beyond a reasonable doubt.

A. Yes.

* * *

Q. [I]f you're sitting here telling [the jurors] that it's possible as the lead investigator in this case, that it's possible that there was something other than intoxication that caused that car to roll, how are the 12 or them, or 11 of them, supposed to say beyond a reasonable doubt she's guilty of intoxication assault?

5

A. *I don't have any evidence that anything else caused that accident*.

Q. Okay. But you don't have any evidence that intoxicated caused it, correct?

A. Just the admission of drinking and the smoking, which tends to dull one's reflexes and ability to drive a vehicle.

\* \* \*

Q. You don't have any indication that she was intoxicated other than her admission of consuming alcohol and marijuana; is that right?

A. Well, I also have the loss of mental and physical faculties due to the fact that the defendant's vehicle did not maintain a lane down the lane of traffic and ended up safely at its destination. It ended up [in] a single vehicle accident.

3 RR 274-77 (emphasis added).

*Cesar Franco's Account*

The night before the accident, nineteen-year-old Cesar Franco and his twenty-year-old girlfriend Appellant, decided to go out.[3] Appellant drove them in her car to a party at her friend's apartment, and they arrived around 10:30 p.m. 2 RR 205-06, 210. Franco did not know anyone at the party, so he began drinking with three or four "random guys." 2 RR 207. Between them, they drank a twenty-four pack of beer. 2 RR 223. While drinking, Franco "started blurring and then blacked out." 2 RR 208-09, 222. He was "real drunk." 2 RR 222-23. Finishing the case of beer was the last part of the night he remembered. 2 RR 207. He did

---

[3] Franco and Appellant began dating in high school and had an off-and-on relationship for four years. They were no longer dating at the time of trial. 2 RR 205, 238.

not remember whether he smoked marijuana that night, although he smoked marijuana about once a week at that time. 2 RR 208-10, 224. He did not remember the drive home from the party or who was driving. 2 RR 210. Franco explained, however, that he did not have a driver's license at that time and that Appellant was the one "mainly driving all the time while [they] were dating." 2 RR 247.

**Appellant's Recorded Statements**

The day of the accident, Officer Hinkle interviewed Appellant at the hospital.[4] 4 RR 5; SX 12. Appellant said that she and her boyfriend had been at a friend's apartment off of Coit and Highway 380 and that they had gotten there about 11:15 or 11:30 at the latest. SX 12-1 at 1:07-1:30, 3:30-3:55, 4:25-4:45. Appellant admitted to drinking two shots of liquor and to smoking a small bowl of marijuana; she claimed, however, that she "didn't even pick up one beer." 4 RR 4; SX 12-1 at 4:05-4:25, 6:05-7:05; SX 12-2 at 0:22-0:27. When asked if she had been the one driving, Appellant stated, "Yeah, it was me, definitely." SX 12-2 at 6:19-6:23. At the end of the interview, Appellant stated, "I know I was in the wrong." 4 RR 8; SX 12-2 at 8:08-8:14. Officer Hinkle understood that to mean that Appellant felt she had been wrong in deciding to drive after smoking marijuana and drinking.

---

[4] Officer Hinkle recorded the interview, although he inadvertently failed to visually capture Appellant on the recording. 4 RR 5-6; SX 12.

7

Appellant's medical records also contained the following notation: "8:28 a.m., general, patient alert and oriented. Patient states, 'I really hate myself for what happened.'" 3 RR 285-86; SX 8. Officer Hinkle testified that this sounded like someone who caused the accident. 3 RR 286.

**The Blood Evidence**

Officer Kryczkowski went to the hospital to obtain a blood sample from Appellant. After he read the applicable statutory warnings to Appellant, she consented, and a registered nurse drew Appellant's blood at 9:04 a.m. 3 RR 30-32, 34-37, 134-36; SX 3, 4, 5, 6, 7. The results of this blood draw showed that Appellant's blood alcohol level was 0.019 grams of alcohol per 100 millileters of blood; meaning it was below the .08 legal limit, approximately four hours after the accident. 3 RR 177-83, 191-92, 198; SX 6, 7.

Prior to the law enforcement blood draw, at 6:30 that same morning, a registered nurse had drawn Appellant's blood for medical purposes. 3 RR 108-113, 191-93; SX 8. Forensic scientist Chris Youngkin testified that, after analyzing the serum test results contained in Appellant's hospital records, and after converting the results to a forensically-useable whole-blood-alcohol-test result, he determined that Appellant had a .091 blood-alcohol level approximately two hours after the accident. 3 RR 192-93, 198-99, 201, 209-10. Youngkin agreed with defense counsel that the most he could say without additional information—such

as when Appellant stopped drinking—was that Appellant's blood-alcohol level could have been higher, lower, or the same at the time of the accident. 3 RR 196, 201-02. He explained, however, that according to studies accepted by the scientific community, alcohol can begin to affect the body in an amount as low as .01 grams of alcohol. 3 RR 203-04. And alcohol can have an effect on a person's lateral vision, making it more difficult to follow the curve of the road, for instance. 3 RR 194-95.

Toxicologist Eduardo Padilla analyzed a sample of Appellant's blood to identify the presence of drugs. 3 RR 223-29; SX 9. In addition to finding morphine, which was given to Appellant at the hospital, he also found a small amount of Clonazepam, a muscle relaxant, which can cause central nervous system depressant effects. 3 RR 231-32. Some of its intoxicating effects include drowsiness, dizziness, blurred vision, confusion, and a general lack of motor coordination. 3 RR 232. He did not test for marijuana in the blood. 3 RR 242; SX 9. Padilla testified that if alcohol, Clonazepam, and marijuana are taken together, they can produce an additive effect, meaning that the overall effect is greater. 3 RR 234-35.

**Franco's Injuries**

*Franco's Account*

Franco did not remember getting into the car to drive home. 2 RR 210-11. He was told by other people that he was thrown from the car. 2 RR 210. Franco was flown by Care Flight to the hospital because his injuries needed immediate attention. 3 RR 28. His mother told him he was in the hospital for four days, and he was unconscious three or four of those days. 2 RR 211, 213. He did not remember what type of medical treatment he received, and he had not reviewed his medical records.[5] 2 RR 211, 213. According to Franco, he suffered "just [a] lower back and side hip injury. That's it." 2 RR 211. He denied that he sustained a brain contusion. 2 RR 211.

When he was released from the hospital, he could walk, but it was "very difficult." 2 RR 213. He wore a back brace for two straight months to assist him with walking, and he took it off only to shower and when he slept on hot days. 2 RR 213, 215, 241-42. The brace was very uncomfortable, but it appeared that it was also necessary, as Franco admitted that it was "the only brace [he] could have used to walk better." 2 RR 213, 215, 241-42. He also admitted he wore the brace

---

[5] Prior to trial, Franco filed an affidavit of non-prosecution, which stated that he did not want Appellant to be prosecuted and that he did not want to testify against her. This remained his position at trial. 2 RR 233-35; DX 6.

to keep from accidently bending his back, which would "hurt very bad." 2 RR 216. He took pain medication and antibiotics. 2 RR 217.

During his two-month recovery period, he rarely left the house, leaving only to visit Appellant. 2 RR 214-15, 241. He had planned before the accident to "start working at a kitchen," but he could not do "full fast movement." 2 RR 241. He got the job after he was "able to walk and everything."[6] 2 RR 214, 241.

Franco acknowledged that he had not asked a lot of questions about his injuries because he felt happy just to be alive and his injuries were not as bad as Appellant's. 2 RR 242. He agreed, however, that he might not fully grasp the extent of his injuries because he did not ask. 2 RR 242. When asked if he was permanently disfigured, Franco stated that his back hurts "very bad" on cold winter days. 2 RR 217, 252. He added that, since leaving the hospital, he had not gotten his back "checked out," stating, "I thought I was fine, and I am." 2 RR 215-16, 252. He explained, however, that while he can still work and it is not a "major issue," he cannot do "certain things," so he is "going to get [himself] checked out." 2 RR 252-53.

---

[6] Although Franco testified that he started working "a month or two" after the accident, he otherwise consistently testified that he stayed at home for two months after the accident. 2 RR 214-15, 241-42.

*Dr. Al West's Account*

Trauma surgeon Dr. Al West testified that, due to the accident, Franco suffered several spine fractures, meaning that several of his back bones were broken. 3 RR 91-93. Surgery was not required because the breaks did not interrupt the structural integrity of the spine; the injury would hurt, but there was no risk for paralysis. 3 RR 94. In his opinion, residual back pain due to fractured vertebrae constituted "protracted impairment" of the "function of a bodily member." 3 RR 107.

According to Dr. West, Franco also suffered from a brain contusion, which is "basically a bruise of the tissue of the brain itself, usually bleeding into the tissue of the brain itself." 3 RR 95. This is dangerous because it interrupts the functioning of some of the brain cells in the area and because the swelling increases pressure on the brain. 3 RR 95-96. Franco's CT scan showed blood in the fluid that cushions the brain, indicating that "there was enough of a blow to cause some bleeding in and around the brain." 3 RR 96.

When defense counsel asked Dr. West whether the brain contusion created a substantial risk of death in Franco, the following dialogue ensued:

A. [Dr. West]: Depends what you mean. I don't know what "substantial" means in that case. I mean, greater than 5 percent? Greater than 100? I mean, you know, about – about 5 percent of people with a brain contusion that size can go on to die.

12

Q. [Defense Counsel]: Okay. Well, I'm talking specifically about him.

A. That's what I'm talking about.

* * *

Q. Is it possible that this brain contusion that Cesar Franco had would not be considered a substantial risk of death? I know this is legalese.

A. It's possible, yes. It is possible that it would not be considered substantial. Those words are very vague. But yes, it is possible that it would not be considered [a] substantial risk of death.

Q. . . . And I guess the payoff question here, in your medical opinion was there a substantial risk of death in Cesar Franco's case with regard to his brain contusion?

A. Initially, yes. As he – you know, again, you're getting – when I first see him, there's a snapshot, and he's got a brain contusion. You don't know if that brain contusion is going to get bigger, going to get worse, so when I see somebody with a brain contusion, I always put them in the intensive care unit for 24 hours because there is a substantial chance that that gets worse and causes death.

3 RR 99-101.

While Dr. West testified that he could not speak to the contusion's long-term effects on Franco because Franco had not done any specific neuropsychiatric testing, he could say that "a portion of [Franco's] brain died because of his contusion. Every contusion, no matter how big or small, a portion of your brain dies." 3 RR 102-03. When asked if Franco's brain repaired itself, Dr. West stated: "[I]t may have repaired itself with scar portion. Again, a portion of his brain died, so depends on how you define 'repaired itself.'" 3 RR 104. Dr. West testified

13

that, medically speaking, a brain contusion constitutes serious bodily injury and that the death of a portion of someone's brain constitutes a protracted loss of a bodily member. 3 RR 97, 107.

## SUMMARY OF THE STATE'S ARGUMENTS

The corpus delicti rule was satisfied because the State introduced evidence other than Appellant's extrajudicial statements showing that the crime of intoxication assault occurred. Because the corpus delicti rule was satisfied, Appellant's own admissions were sufficient to establish that she was driving at the time of the accident. Also, Appellant's .091 blood-alcohol level two hours after the accident, coupled with her admissions to drinking alcohol and smoking marijuana and other corroborating evidence, established that she was driving while intoxicated at the time of the accident. While Franco downplayed the severity of his injuries, his testimony along with that of an attending doctor, established that Franco suffered serious bodily injury.

## STATE'S REPLY TO APPELLANT'S ISSUES
(The Corpus Delicti Rule & Sufficiency of the Evidence)

In three issues, Appellant asserts that the evidence is insufficient to support a conviction for intoxication assault because: (1) her own extrajudicial admissions were the only evidence that she operated the vehicle, and the State failed to introduce any corroborating evidence, as required by the corpus delicti rule; and the State failed to produce sufficient evidence (2) that she was intoxicated at the time of the accident and (3) that Cesar Franco suffered serious bodily injury.

Appellant's first argument comingles two concepts: the *Jackson v. Virginia* sufficiency review and the corpus delicti rule. The corpus delicti rule was satisfied here because the State introduced evidence other than Appellant's extrajudicial statements showing that the crime of intoxication assault occurred. Because the corpus delicti rule was satisfied, Appellant's own admissions were sufficient to establish that she was driving at the time of the accident. Also, Appellant's .091 blood-alcohol level two hours after the accident, coupled with her admissions to drinking alcohol and smoking marijuana and other corroborating evidence, established that she was driving while intoxicated at the time of the accident. While Franco downplayed the severity of his injuries, his testimony along with that of an attending doctor, established that Franco suffered serious bodily injury.

16

## I. The Corpus Delicti Rule Was Satisfied

"The *corpus delicti* rule is a common law, judicially created, doctrine—the purpose of which was to ensure that a person would not be convicted based solely on his own false confession to a crime that never occurred." *Carrizales v. State*, 414 S.W.3d 737, 740 (Tex. Crim. App. 2013). The rule is satisfied if "some evidence exists outside of the extra-judicial confession which, considered alone or in connection with the confession, shows that the crime actually occurred." *Salazar v. State*, 86 S.W.3d 640, 645 (Tex. Crim. App. 2002).

Although Appellant argues that the corroborating evidence is not sufficient because it does not corroborate her extrajudicial confession that she was the driver, "this is not the test or the purpose for the corpus delicti rule."[7] *Johnson v. State*, 299 S.W.3d 491, 499 (Tex. App.—Tyler 2009, no pet.). "The corpus delicti rule has the effect of requiring evidence to corroborate a confession, but only to the extent that there must have been a crime committed." *Id.* (citing *Salazar*, 86 S.W.3d at 644-45). The rule does not "require any independent evidence that the defendant was the criminal culprit." *Salazar*, 86 S.W.3d at 644.

The corpus delicti of intoxication assault is that *someone* (1) by accident or mistake (2) while driving a motor vehicle (3) in a public place (4) while

---

[7] Appellant did not assert at trial that the corpus delicti rule had not been satisfied. Although she argued that there was no evidence that she operated a motor vehicle, she did so in the context of asking for a directed verdict. 4 RR 45-46. No instruction on corpus delicti was given in the jury charge.

17

intoxicated (5) and by reason of that intoxication (6) caused serious bodily injury to another. *See* Tex. Penal Code § 49.07(a); *McCann v. State*, 433 S.W.3d 642, 646 (Tex. App.—Houston [1st Dist.] 2014, no pet.) (setting out the corpus delicti of DWI). "The corroborating evidence need not prove the underlying offense conclusively; there simply must be some evidence that renders the commission of the offense more probable than it would be without the evidence." *McCann*, 433 S.W.3d at 646; *see Cardenas v. State*, 30 S.W.3d 384, 390 (Tex. Crim. App. 2000).

Here, there was sufficient corroborating evidence that the crime of intoxication assault actually occurred and that it had not been merely invented by Appellant. According to Franco, Appellant drove the two of them to a party in her car. They arrived at about 10:30 p.m., and Franco began drinking beer, got drunk, and blacked out. 2 RR 205-06, 208-10, 222. By all accounts, at about 4:30 a.m., Franco and Appellant were found near a badly-damaged car located in the median of a public roadway. No other people or cars were associated with the accident. 2 RR 176-77; 3 RR 21-28. The crime scene investigation revealed that the car had been heading southbound (in the direction of Franco's Plano home) and that the car had simply drifted gradually from the left to right lane until it hit the curb and flipped several times. 2 RR 204; 3 RR 244-58. There was no evidence that the weather or road conditions played a part in the accident. 2 RR 178-79, 182-83. Franco and Appellant both sustained severe injuries that were consistent with

18

having been inside the car at the time of the accident.[8]  3 RR 91-93, 95; SX 8; DX 5.  Two hours after the accident, Appellant's blood-alcohol level was over the legal limit at .091.  3 RR 192-93.

Because the State produced some evidence (other than Appellant's statements that she had been drinking and driving) that renders the commission of intoxication assault more probable than it would be without the evidence, the corpus delicti rule is satisfied.  *See McCann*, 433 S.W.3d at 646.

Appellant's reliance on *Threet*, *Coleman*, and *Hanson* is misplaced.[9]  *See* App. Br. 12-14; *see also McCann*, 433 S.W.3d at 647-48 (distinguishing *Threet* and *Coleman*).  For instance, in *Threet*, the Court of Criminal Appeals held that the evidence was insufficient to prove DWI where a highway patrolman found a wrecked pickup truck with no driver, the patrolman was directed to the hospital where he found an intoxicated Threet, and Threet confessed to being the driver of the crashed truck.[10]  250 S.W.2d at 200.  *Threet* is most obviously distinguishable from the instant case because, unlike Threet, Appellant was found at the accident scene instead of at the hospital.  Further, to the extent *Threet* suggests that corpus

---

[8] Although the extent of Appellant's injuries were not at issue at trial, there is evidence that she suffered an open scalp wound and other injuries for which she was in the hospital for seven days. SX 8.

[9] *Threet v. State*, 250 S.W.2d 200 (Tex. Crim. App. 1952); *Hanson v. State*, 781 S.W.2d 445, 446 (Tex. App.—Fort Worth 1989), *abated on other grounds*, 790 S.W.2d 646 (Tex. Crim. App. 1990); *Coleman v. State*, 704 S.W.2d 511, 512 (Tex. App.—Houston [1st Dist.] 1986, pet. ref'd).

[10] Appellant misstates that Threet was found standing next to the overturned pickup. App. Br. 12.

19

delicti includes the identity of the person who committed the offense, this holding was disapproved of in *Gribble v. State*, 808 S.W.2d 65, 70 n.11 (Tex. Crim. App. 1990). Likewise, the holdings of the courts of appeals in *Coleman* and *Hanson* are questionable to the extent they suggest that evidence of the defendant's driving is required to prove the corpus delicti of DWI. *See Folk v. State*, 797 S.W.2d 141, 144 (Tex. App.—Austin 1990, pet. ref'd) (declining to follow *Coleman* and *Hanson* for this reason). Because *Threet* is distinguishable, and *Coleman* and *Hanson* are not decisions of this Court, none of these cases is binding authority.

In sum, because there is evidence outside of Appellant's extrajudicial confession showing that the crime of intoxication assault occurred, the corpus delicti rule was satisfied. *See generally Kellis v. State*, No. 14-04-01044-CR, 2006 WL 278380, at *3 (Tex. App.—Houston [14th Dist.] Feb. 7, 2006, no pet.) (not designated for publication) ("There is no serious question whether the crime of intoxication assault actually occurred. The State presented expert testimony regarding accident reconstruction, the condition of the vehicles, the medical condition of complainant, and appellant's intoxication levels, which provided more than 'some independent evidence' to prove that the crime actually occurred."). This portion of Appellant's first issue should be overruled.

## II. The Evidence Supports the Conviction

The instant indictment alleged that Appellant operated a motor vehicle in a public place while intoxicated, and by reason of such intoxication, caused serious bodily injury to Cesar Franco by accident or mistake, by causing the vehicle she was driving to roll over while Franco was a passenger. CR 11.

### A. *Standard of Review*

In determining the sufficiency of the evidence, the reviewing court considers all evidence in the light most favorable to the jury's verdict and determines whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010). The trier of fact is the sole judge of the weight and credibility given to witness testimony, and it is within the sole province of the jury to resolve any conflicts in the evidence. *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). The jury may draw multiple reasonable inferences as long as each inference is supported by the evidence presented at trial. *See Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007). The reviewing court may not act as a "thirteenth juror" and reweigh the jury's determinations of the weight or credibility of the evidence. *Williams v. State,* 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

21

## B. *Appellant was the Driver*

Provided there is other evidence that a crime occurred, the identity of the defendant as the perpetrator may rest alone upon her confession. *See Vaughn v. State*, 833 S.W.2d 180, 182 (Tex. App.—Dallas 1992, pet. ref'd); *see also Carrizales*, 414 S.W.3d at 743 ("[A] defendant's extrajudicial confession does not constitute legally sufficient evidence of guilt *absent* independent evidence of the *corpus delicti*.") (emphasis added) (quoting *Hacker v. State*, 389 S.W.3d 860, 865-66 (Tex. Crim. App. 2013)). Because the evidence in this case satisfied the corpus delicti rule, Appellant's statement that she had been driving at the time of the accident can be considered in determining the sufficiency of the evidence.

Indeed, Appellant volunteered to the first person on the scene, Holly Love, that she had been driving. 2 RR 180. And when asked by Officer Kryczkowski who had been driving, Appellant stated, "Me," and she described driving through the intersection at Stonebridge and Custer, which the officer verified as being the last intersection before the accident. 3 RR 26-27, 52-53; SX 2 at 3:23. When asked during a recorded interview whether she had been the one driving, Appellant stated, "Yeah, it was me, definitely." SX12-2 at 6:20-6:22. No controverting evidence was introduced. Moreover, Franco testified that he did not have a driver's license at the time, that Appellant drove them to the party in her car, that Appellant was the one "mainly driving all the time while [they] were dating," and

22

that he had blacked out at the party. 2 RR 210, 247. Viewed in the light most favorable to the verdict, the jury could have rationally determined beyond a reasonable doubt that Appellant had been driving at the time of the accident. This portion of Appellant's first issue should be overruled.

## C. Appellant Was Driving While Intoxicated at the Time of the Accident

The State need not establish the precise time of an accident or the defendant's driving to prove the offense of DWI. *See McCann*, 433 S.W.3d at 649. To establish the DWI element of intoxication assault, however, there must be a temporal link between Appellant's intoxication and her driving.[11] *See Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010). Such a finding can be supported solely by circumstantial evidence. *See id.* at 462; *McCann*, 433 S.W.3d at 649.

Here, Appellant's .091 blood-alcohol level two hours after the accident was highly probative, and, coupled with other evidence, was sufficient to prove intoxication at the time of driving. *See Kirsch v. State*, 306 S.W.3d 738, 745 (Tex. Crim. App. 2010). Indeed, the whole window of events was fairly narrow. By Appellant's account, she and Franco arrived at the party at about 11:15 or 11:30 p.m. SX 12-1 at 4:25-4:45. Appellant also estimated that she drank about an hour

---

[11] "Intoxication" is defined as: (1) not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, or a combination of two or more of those substances into the body; or (2) having an alcohol concentration of 0.08 or more. *See* Tex. Penal Code § 49.01(2)(A). Here, the jury instructions included both definitions. CR 53.

and fifteen minutes prior to the crash. SX 12-1 at 1:32-1:39. And the evidence suggests that the accident happened sometime between 4:00 and 4:30 a.m.[12]

In addition, Appellant's admissions to drinking alcohol and smoking marijuana within this relatively limited timeframe before the accident strengthened the inference that she was intoxicated at the time of driving. *See Kirsch*, 306 S.W.3d at 745. Appellant admitted to Officer Kryczkowski at the scene and in her recorded interview with Officer Hinkle that she had consumed alcohol and smoked marijuana. 3 RR 27-28; 4 RR 4; SX 12-1 at 4:05-4:25, 6:05-7:05; SX 12-2 at 0:22-0:27. Appellant also spontaneously admitted to civilian Love that she had drank three beers and smoked marijuana at a party, and the jury could have believed, as Love did, that this was Appellant's guilty conscience speaking. 2 RR 196, 201-02. Further, the jury could have reasonably concluded that, in admitting during her interview that she was "in the wrong," Appellant was connecting her intoxicated driving with the accident. 4 RR 8; SX 12-2 at 8:08-8:14.

That Appellant was involved in a single-car accident is still further evidence of the link between her intoxication and her driving at the time of the accident. *See*

---

[12] Holly Love arrived at the scene between 4:00 and 4:30 a.m. 2 RR 175-76. While the exact time of the accident (and thus Appellant's driving) was not known, Appellant accounted for all of the time between the accident and the arrival of Love and the other civilians. In the recorded police interview, Appellant described the accident itself, saying that the vehicle flipped three or four times and that she knew she had to get out of the vehicle. She also described initially not knowing where her boyfriend was, finding him injured, and then by her estimate, the first cars came by three or four minutes later. SX 12-1 at 2:16-3:09; SX 12-2 at 3:28-3:41.

*Scillitani v. State*, 343 S.W.3d 914, 918-19 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd). Indeed, while Officer Hinkle testified that he did not have any evidence as to the exact cause of the accident, he underscored that he did not have any evidence that anything besides Appellant's intoxication caused the accident. 3 RR 276-77. Not only that, the last thing Appellant remembered was an intersection approximately a half mile back from the accident, and she had no explanation of how the accident occurred. 3 RR 25-27. Finally, Officer Kryczkowski offered his expert opinion that Appellant had been driving while intoxicated that night, further confirming the sufficiency of the evidence on this point. 3 RR 78, 82; *see Henderson v. State*, 29 S.W.3d 616, 622 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd); *see also Zill v. State*, 355 S.W.3d 778, 785-86 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (holding that a police officer's testimony about a defendant's behavior and opinion that the defendant is intoxicated provides sufficient support to uphold a jury verdict).

Viewing the evidence in the light most favorable to the verdict, a rational jury could have found beyond a reasonable doubt that Appellant was driving while intoxicated at the time of the accident. Appellant's second issue should be overruled.

*C.  Cesar Franco Suffered Serious Bodily Injury*

For purposes of intoxication assault, serious bodily injury includes an injury that "creates a substantial risk of death or that causes serious permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." Tex. Penal Code § 49.07(b).  Courts decide whether an injury qualifies as serious bodily injury on a case-by-case basis.  *See Moore v. State*, 739 S.W.2d 347, 352 (Tex. Crim. App. 1987).

Appellant asserts that the only evidence presented regarding Cesar Franco's actual injuries indicated that they were not serious.  App. Br. 22.  While Franco downplayed the severity of his injuries, the record nonetheless demonstrates that his broken back bones and his brain contusion constituted serious bodily injury.[13]

*i. Franco's Back*

Appellant argues that there is no evidence of any protracted impairment of the functioning of Franco's back because Franco returned to work after two months, he did not seek additional medical treatment, and he did not suffer any lingering effects from his injury except some pain, which he contends does not constitute impairment of "the function of a bodily member."  App. Br. 25-27.

---

[13] Franco was essentially a reluctant State's witness, and his attempts to downplay his knowledge of the severity and impact of his injuries are apparent in the record.  For instance, he testified that he did not break any bones and did not suffer from a brain contusion, although Dr. West established otherwise.

In assessing the sufficiency of the evidence to establish serious bodily injury, however, the relevant issue is the impairing quality of the injury *as it was inflicted*, not after the effects had been ameliorated or exacerbated by other actions such as medical treatment. *See Taylor v. State*, 71 S.W.3d 792, 794 (Tex. App.—Texarkana 2002, pet. ref'd). To establish protracted impairment, an organ or bodily member must lose some function. *See Andrus v. State*, Nos. 05-08-00703-CR, 05-08-00704-CR, 2010 WL 797196, at *2 (Tex. App.—Dallas Mar. 10, 2010, no pet.) (not designated for publication). The loss of function, however, need only be protracted, not permanent. *Id.* "Protracted" has been defined as "extended, lengthened, prolonged, or continued." *See Moore*, 739 S.W.2d at 349. The jury is free to apply common sense, knowledge, and experience gained in the ordinary affairs of life in drawing reasonable inferences from the evidence presented. *See Jackson v. State*, 399 S.W.3d 285, 292 (Tex. App.—Waco 2013, no pet.) (applying the principle in assessing whether there was serious bodily injury).

Here, Franco was ejected from a car during a horrible rollover accident, and several of his back bones were broken. As a result, Franco was virtually homebound, could not walk well without a brace, could not bend over without excruciating pain, and could not work for two months.[14] At the time of trial (two

---

[14] The fact that Franco had not sought additional medical treatment at the time of trial did not change the fact that he could not walk well enough (even with the brace) to function effectively outside of the house, much less go to work. *See Taylor*, 71 S.W.3d at 794.

27

years and eight months later), Franco's back still hurt "very bad" on cold days, he still had to be careful of his back at work, and there were still certain things that he could not do.[15] 3 RR 217, 241, 252-53. A rational jury could conclude that Franco suffered the protracted impairment of the function of his back, a bodily member. *See Madden v. State*, 911 S.W.2d 236, 244 (Tex. App.—Waco 1987, pet. ref'd) (inability to walk for four weeks because of injured left hip constituted serious bodily injury); *Coshatt v. State*, 744 S.W.2d 633, 636 (Tex. App.—Dallas 1987, pet. ref'd) (fractured vertebrae requiring six weeks of bed rest, no heavy work for three months, and loss of partial use of back constituted serious bodily injury). *Cf. Moore*, 739 S.W.2d at 351-52 (holding that evidence of an injured back that required a few hours in the hospital and rest for a week was insufficient to establish serious bodily injury).

*ii. Franco's Brain Contusion*

Appellant asserts that Dr. West provided no testimony regarding the actual long-term effects of the brain contusion or whether it created a substantial risk of death. App. Br. 23. He contends that Dr. West's answers to several hypothetical scenarios were insufficient to establish serious bodily injury, citing *Moore v. State*,

---

[15] Further, Dr. West testified that residual back pain due to fractured vertebrae constituted impairment of the function of a bodily member. 3 RR 107.

739 S.W.2d at 352.[16]   The situation warned against in *Moore* is distinguishable from the instant case, however.  In *Moore*, the victim suffered a stab wound to his back, he was taken to the emergency room where he was treated and stayed for three hours, he was bedridden, and it was "at least a week" before he could go out and see people.  *See* 739 S.W.2d at 349-52.  At trial, the attending physician in *Moore* testified that the victim's wounds were not the type of injuries that would create a substantial risk of death or that would cause a protracted loss or impairment of the function of any bodily member or organ.  *Id.* at 350-51.  Only when asked if the wound could have created a substantial risk of death if it had been left untreated did the doctor respond that there was a possibility that the wound could have become infected, which could have been fatal.  *Id.* at 350.  The Court held that there was insufficient logical support in the evidence to sustain the jury's implicit finding of serious bodily injury.  *Id*. at 355.

Here, while Dr. West did answer some hypothetical questions, he also testified that Franco's brain contusion as inflicted created both a substantial risk of death and the protracted impairment of the function of his brain.   Indeed, while Dr. West initially agreed with defense counsel that it was possible that Franco's brain contusion would not be considered a substantial risk of death, when asked

---

[16] The *Moore* Court stated that "the prosecution must present relevant and probative evidence from which a rational trier of fact could infer beyond a reasonable doubt that the bodily injury the victim sustained created a substantial risk of death from the injury itself, and not from some hypothetical or mere possibility that the bodily injury created a substantial risk of death."  *Id.*

again for his medical opinion whether Franco's brain contusion caused a substantial risk of death, Dr. West stated: "Initially, yes. . . . [W]hen I see somebody with a brain contusion, I always put them in the intensive care unit for 24 hours because there is a substantial chance that that gets worse and causes death." 3 RR 99-101. A jury could rationally believe that Franco's brain contusion created a substantial risk of death. In fact, in *Moore*, the Court explained:

> We do not mean by this to say that the risk of death must be grave, or that the injury be more likely [than] not to produce death even if treated. Rather, if the injury presents an appreciable risk of death, whether treated or not, that risk is substantial enough for a rational trier of fact to conclude or infer that "serious bodily injury" has been sustained by the victim.

739 S.W.2d at 354. The instant situation differs dramatically from *Moore* in that the doctor in *Moore* noted that any type of stab wound to the back carries a potential risk of serious harm and death, but reiterated several times over that the victim's stab wound did not constitute serious bodily injury. *See Moore*, 738 S.W.2d at 349-51.

Dr. West also testified that a portion of Franco's brain died as a result of the brain contusion, that the death of a portion of someone's brain constitutes a protracted loss of a bodily member, and that a brain contusion constitutes serious bodily injury. 3 RR 97, 107. A doctor's testimony that a wound constituted serious bodily injury has been held to be sufficient to establish serious bodily

injury. *See Barrera v. State*, 820 S.W.2d 194, 196 (Tex. App.—Corpus Christi 1991, pet. ref'd) (citing *Boney v. State*, 572 S.W.2d 529, 532 (Tex. Crim. App. 1978)); *see also Mechell v. State*, 374 S.W.3d 454, 457 (Tex. App.—Waco 2011, pet. ref'd) (citing *Boney*). The jury could have reasonably concluded that Franco's brain contusion created both a substantial risk of death and the protracted impairment of the function of his brain. Appellant's third issue should be overruled.

## PRAYER

Appellant's trial was without prejudicial error. The State prays that Appellant's conviction and sentence be affirmed.

Respectfully submitted,

**GREG WILLIS**
Criminal District Attorney
Collin County, Texas

**JOHN R. ROLATER, JR.**
Assistant Criminal District Attorney
Chief of the Appellate Division

/s/ Libby J. Lange
**LIBBY J. LANGE**
Assistant Criminal District Attorney
2100 Bloomdale Rd., Suite 200
McKinney, TX 75071
(972) 548-4323
FAX (214) 491-4860
State Bar No. 11910100
llange@co.collin.tx.us

## CERTIFICATE OF SERVICE

The State has e-served counsel for Appellant, Charles Pelowski, and sent a courtesy copy of the State's Brief to c.pelowski@vitzlaw.com, on this the 19th day of February, 2015.

/s/ Libby J. Lange
Libby J. Lange


## CERTIFICATE OF COMPLIANCE

This brief complies with the word limitations in Texas Rule of Appellate Procedure 9.4(i)(2). In reliance on the word count of the computer program used to prepare this brief, the undersigned attorney certifies that this brief contains 7,226 words, exclusive of the sections of the brief exempted by Rule 9.4(i)(1).

/s/ Libby J. Lange
Libby J. Lange